[Cite as *State v. Currie*, 2025-Ohio-670.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|                        |   |                                        |
|------------------------|---|----------------------------------------|
| STATE OF OHIO,         | : | APPEAL NO. C-240273                    |
|                        |   | TRIAL NO. B-2305268                    |
| Plaintiff-Appellee,    | : |                                        |
|                        |   |                                        |
| vs.                    | : | *O P I N I O N*                        |
|                        |   |                                        |
| KAJUAN CURRIE,         | : |                                        |
|                        |   |                                        |
| Defendant-Appellant.   | : |                                        |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: February 28, 2025

*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Kessler Defense LLC* and *Stephanie Kessler*, for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** Probation officers, acting on an anonymous tip that defendant-appellant Kajuan Currie violated the terms of his probation, searched Currie and his apartment and eventually recovered a bag of illegal substances. After an unsuccessful challenge to the constitutionality of the searches, Currie pleaded no contest and was sentenced to three-to-four-years-and-six-months of incarceration for trafficking in a fentanyl-related compound.

**{¶2}** On appeal, Currie challenges the constitutionality of the searches, arguing that an anonymous tip, which included screenshots of social media posts of a man later identified as Currie with a handgun in his waistband, did not provide probation officers reasonable grounds to suspect that Currie violated his probation. We hold that the probation officer's experiences and familiarity with Currie verified the information in the tip as credible and gave the probation officers a particularized and objective basis for suspecting Currie of a probation violation.

**{¶3}** Currie also maintains that his sentence is contrary to law because the trial court erroneously determined that R.C. 2929.14 prescribes a three-year statutory minimum for a second-degree-felony conviction. But his sentence is not contrary to law because the trial court selected the three-year minimum sentence as it was required to do, that minimum sentence falls within the range prescribed by R.C. 2929.14, and Currie's attorney told the trial court that he was subject to a three-year minimum sentence.

**{¶4}** We overrule the two assignments of error and affirm the conviction.

### I.   Factual and Procedural History

**{¶5}**   In 2022, Currie was sentenced to 18 months of community control, or probation,[1] after pleading guilty to trafficking in and possessing a fentanyl-related compound. As part of his probation, Currie agreed in writing to three conditions relevant to this appeal. He agreed to not "own, possess, or carry a firearm." He agreed to not "illegally obtain or use controlled substances." And he agreed that he was "subject to search in accordance with [R.C.] 2951.02," including searches of Currie, his "place of residence, motor vehicle, cell phone, and other packages."

**{¶6}**   After Currie's probation officer received screenshots of text messages and social media posts from an anonymous informant, probation officers searched Currie and his alleged residence. Currie was arrested and taken to the Hamilton County Justice Center ("Justice Center"). There, law enforcement's strip search of Currie yielded a bag of controlled substances. As a result, Currie was charged with 16 felonies for possessing and trafficking in drugs.

**{¶7}**   Currie moved to suppress the drugs and challenged the constitutionality of the stop and frisk of Currie on the street, the scope of that frisk, the search of his apartment, his arrest, and the jailhouse search of Currie.

#### Suppression hearing

**{¶8}**   At the suppression hearing, Probation Officer Winter recalled meeting Currie in April 2023 when she reviewed with him the conditions of his community control. The two signed an agreement containing those conditions. In October 2023, Currie reported to Winter, who noticed that Currie had dyed his hair. She testified that, in April 2023, his hair "was a darker color [and] didn't have the yellow."

---

[1] "[C]ommunity control is the functional equivalent of probation." *State v. Talty*, 2004-Ohio-4888, ¶ 16.

3

{¶9} Two weeks later, Winter received a text message "from an anonymous person that [Currie] was potentially carrying firearms and possessing illegal narcotics." The anonymous tip included "screenshots of a text message and pictures – screenshots of pictures." Winter had no experience with the informant and made no attempt to verify the information.

{¶10} First, the text messages Winter received included screenshots of an Instagram story posted by an account with the username "Kwonn Currie." The story contained two photos of a man with a handgun in his waistband. Winter recognized that person as Currie because "he had the same exact hair color when he reported in."

{¶11} Second, there was a screenshot of text messages from a redacted phone number with two pictures of a white substance and a message reading, "Cooking Crack," followed by a laughing emoji. The anonymous informant told Winter that Currie sent those text messages. Winter could not say for certain that Currie sent the "Cooking Crack" text message, if the substance in the photo was crack cocaine, when the Instagram story was posted, or when the photos were taken.

{¶12} After Winter received the messages, probation officers were dispatched to Currie's apartment on Race Street in Cincinnati's densely populated Over-The-Rhine neighborhood. Probation Officer Mossburger spotted Currie "half a block" away from the apartment and cuffed him over concerns that he had a firearm.

{¶13} With Currie handcuffed, Mossburger "went through [Currie's] pockets, patted down his waistband area, patted down his legs going down both sides, in his rectum area and in his front private area." He found nothing incriminating in his pockets, waistband, or in his pantlegs. Mossburger stretched the elastic on Currie's waistband and underwear to visually inspect Currie's genitalia and buttocks. And during the frisk, he found a "hard bulge that was in between . . . his buttocks area."

4

Mossburger knew the bulge was not part of Currie's anatomy and was concerned that it was "illegal narcotics."

**{¶14}** The probation officers argued with Currie about the bulge and instructed him to spread his legs and squat. When Currie questioned why Mossburger was grabbing his "ass," probation officers threatened to forcibly remove the object from Currie's body. Ultimately, the probation officers put Currie in a police car and took him to the apartment.

**{¶15}** Currie remained in the car as Winter and other probation officers entered the apartment and found "multiple people inside of this residence." In a bedroom, they found "a firearm in plain view" tucked between a mattress and a bedframe and another firearm under the mattress. Winter confirmed that one person in the apartment, C.L., claimed ownership of those firearms. Currie was not charged for those firearms.

**{¶16}** Probation officers arrested Currie for a probation violation and transported him to the Justice Center. Probation officers alerted Hamilton County Sheriff Deputy Edmonds "[t]hat there was something in – a nugget-like something in his sensitive – in a sensitive area that we could not access publicly on the street." Edmonds frisked Currie and did a digital scan of Currie's body. Next, Edmonds stood roughly three feet away from Currie and instructed him to undress, squat, and cough. Edmonds noticed an object protruding from Currie's anus and had Currie remove the bag from his rectum. The bag was small and "had like blue, some type of blue crystallized drug that was in it." Edmonds suspected the substance was narcotics.

**{¶17}** Currie called two witnesses in support of his motion to suppress. N.H. testified that Currie was with her the night before the search. C.L. testified that Currie was running an errand for her on the day of the search. C.L. told officers that Currie

did not live in the apartment, that she did not consent to a search, and that the firearms belonged to her and were rightfully in her apartment. She noted that people convicted of a felony were not allowed into her apartment because of her firearms.

**{¶18}** The trial court denied the motion to suppress. It found that the anonymous tip, standing alone, failed to establish reasonable suspicion. But Winter's observations of Currie's hair corroborated the tip—the "information and identifying hair color gave [officers] the requisite reasonable suspicion [of a probation violation] to stop and search Defendant near the reported Race Street Address." Next, the trial court found that the frisk revealed a hard bulge that was not part of Currie's anatomy and the "totality of the circumstances," including the firearms in the apartment, established probable cause to arrest Currie. And because Edmonds had complied with the relevant strip-search protocol, the search at the Justice Center was lawful.

### *Plea and sentencing hearing*

**{¶19}** Currie pleaded no contest to the 16 charges. At the hearing, the trial court informed Currie that "counts 1 through 4, 11, and 12 are felonies of the second degree, which carry a penalty of two to eight years." The trial court asked Currie if he understood that "at sentencing the Court will select the minimum term for the range of penalties for the crime [and] for the felony of the second degree, it's two to eight years. I will select the minimum term from that range."

**{¶20}** The trial court reviewed hypothetical sentences with Currie to gauge his understanding of how the maximum term is calculated and asked the parties what they calculated as "the longest minimum sentence that he could serve." Currie's counsel responded, "I thought that was that three we discussed earlier." The trial court later explained that, after merging the cases, "the minimum prison term, I believe, would be three years, and the maximum term would then be twelve years."

**{¶21}** The trial court accepted Currie's no-contest pleas, found him guilty on all 16 counts, and proceeded to sentencing. The trial court merged counts two through 16 into count one and imposed a three-to-four-years-and-six-month sentence.

## II.   Analysis

**{¶22}** On appeal, Currie challenges the trial court's denial of his motion to suppress and his sentence in two assignments of error. First, he argues that the searches of his body and the apartment exceeded the scope of his consent because the probation officers lacked reasonable grounds for believing that he violated his probation. Second, he claims that the trial court erroneously imposed a three-year minimum as part of his indefinite sentence when the sentencing statute provides for a two-year minimum sentence.

### A. <u>The anonymous tip and corroboration established reasonable grounds to believe Currie violated his probation</u>

**{¶23}** An appeal of the trial court's decision denying a motion to suppress raises a mixed question of law and fact. *State v. Hayden*, 2022-Ohio-3933, ¶ 15 (1st Dist.). The trial court's factual findings are accepted as true if those findings are supported by competent and credible evidence. *Id.* But applying those findings to the relevant legal standard is a question of law that we review de novo. *Id.*

1. <u>Probationer searches under the Fourth Amendment</u>

**{¶24}** The Fourth Amendment to the United States Constitution guarantees the right to be free from unreasonable searches and seizures. But probationers "'do not enjoy "the absolute liberty to which every citizen is entitled."'" *United States v. Knights*, 534 U.S. 112, 117 (2001), quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987), quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). A probationer's consent to searches may excuse the Fourth Amendment's warrant requirement. *See*

*State v. Campbell*, 2022-Ohio-3626, ¶ 12; *see also Samson v. California*, 547 U.S. 843, 848 (2006). In *Knights*, the Supreme Court of the United States reasoned that if there is "reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id*. The Fourth Amendment merely requires reasonable suspicion to justify a warrantless search of a probationer. *Id*. at 120.

**{¶25}** Currie consented to being "subject to search in accordance with [R.C.] 2951.02." Under R.C. 2951.02(A)(1)(a), a warrantless search of a probationer is permissible if probation officers "have reasonable grounds to believe that the offender is not abiding by the law or otherwise is not complying with the conditions of the . . . felony offender's nonresidential sanction." That "reasonable grounds standard does not mandate the level of certainty required to establish probable cause." *State v. Helmbright,* 2013-Ohio-1143, ¶ 21 (10th Dist.). That is so because the "special needs" of the State's supervisory relationship with probationers and administration of its probation system justify a departure from the Fourth Amendment's warrant-and-probable-cause requirements. *See Griffin* at 874.

**{¶26}** Reasonable grounds exist if the information known to the probation officer establishes a likelihood that a search will yield evidence of a probation violation. *State v. Apple*, 2024-Ohio-2286, ¶ 24 (2d Dist.). Reasonable grounds "mirrors the federal reasonable suspicion standard." *Id*.; *see State v. Sowards*, 2007-Ohio-4863, ¶ 28, fn. 4 (4th Dist.). This requires more than a mere "inchoate and unparticularized suspicion or 'hunch.'" *In re J.C.,* 2019-Ohio-4815, ¶ 14 (1st Dist.), quoting *State v. Jones,* 70 Ohio App.3d 554, 556-557 (2d Dist. 1990), citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968). A search of a probationer is supported by reasonable suspicion if the

probation officer has ""'articulable reason" and "a particularized and objective basis for suspecting the particular person,"'" based on a totality of the circumstances, of violating the terms of his probation. *State v. Jackson*, 2012-Ohio-5548, ¶ 41 (5th Dist.), quoting *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999), quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

2. <u>The anonymous tip and Winter's corroboration created reasonable grounds to believe that Currie had violated the terms of his probation</u>

**{¶27}** Currie argues that the anonymous tip failed to establish reasonable grounds to justify a search under R.C. 2951.02.

**{¶28}** Reasonable suspicion hinges on "'both the content of information possessed by police and its degree of reliability.'" *Navarette v. California*, 572 U.S. 393, 397 (2014), quoting *Alabama v. White*, 496 U.S. 325, 330 (1990). Generally, "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *White* at 329. Ordinary citizens providing information to police are unaccustomed to "provid[ing] extensive recitations of the basis of their everyday observations." *Id.* Without any predictive information, an anonymous tip leaves police "without means to test the informant's knowledge or credibility." *Florida v. J.L.,* 529 U.S. 266, 271 (2000). But the law requires some "indicia of reliability present." *Id.* This is why an anonymous tip, standing alone, rarely establishes reasonable suspicion. *See id.* at 268; *see also State v. Smith,* 2005-Ohio-5204, ¶ 13 (1st Dist.).

**{¶29}** Yet, an anonymous tip can, "under appropriate circumstances . . . demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette* at 397, quoting *White* at 327. Law enforcement may rely upon an anonymous tip if it is "suitably corroborated." *J.L.* at 271. Likewise, an anonymous tip consisting of an "'explicit and detailed description of alleged

wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case.'" *Navarette* at 399, quoting *Illinois v. Gates*, 462 U.S. 213, 234 (1983). At a minimum, the tip must consist of more than "'easily obtained facts and conditions existing at the time of the tip.'" *Smith* at ¶ 13, quoting *White* at 327.

**{¶30}** Currie likens the anonymous tip in this case to the anonymous tips in *J.L.* and *State v. Riley*, 141 Ohio App.3d 409 (2d Dist. 2001) to argue that his motion to suppress should have been granted. In *J.L.*, an anonymous caller reported to police that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *J.L.* at 268. And in *Riley,* an anonymous caller reported a man "with red hair, wearing a black hooded sweatshirt and blue jeans" carrying a concealed weapon in his waistband. *Riley* at 410. In both *J.L.* and *Riley,* the anonymous tips were insufficient to create reasonable suspicion to justify a stop and frisk of a person. *J.L.* at 268.

**{¶31}** But neither *J.L.* nor *Riley* addressed probationer searches. As part of its analysis of probationer searches under the special-needs exception, the *Griffin* Court deemed it "unrealistic and destructive of the whole object of the continuing probation relationship to insist upon the same degree of demonstrable reliability of particular items of supporting data, and upon the same degree of certainty of violation, as is required in other contexts." *Griffin*, 483 U.S. at 879. A probation officer "must be able to proceed on the basis of [her] entire experience with the probationer, and to assess probabilities in the light of [her] knowledge of his life, character, and circumstances." *Id*.

**{¶32}** We hold that Winter's familiarity with Currie distinguishes the anonymous tip in this case from the anonymous tips in *J.L.* and *Riley*.

{¶33} Most cases addressing the weight of an anonymous tip as part of a reasonable-suspicion analysis involve anonymous phone calls. But here, the photographic evidence conveyed more than a mere description of Currie. Winter received a screenshot of a social media post by an account with a username that is phonetically identical to Currie's name. And Winter identified Currie as the man with a firearm in his waistband in that photo.

{¶34} Currie maintains that Winter's reliance on the social media post was misplaced because she did not know when the photo was taken and therefore, the photo could have predated his probation. He argues that reasonable suspicion required her to corroborate the date of the photograph. But Winter believed the photo was recent because of Currie's unique physical attributes in the photograph. In the photograph, Currie's hair is dyed a color that falls somewhere between orange and yellow. Probation Officer Winter found his hair color significant because this was a recent change—his hair was darker when she met him in April 2023. In the bodycam footage in the record, Currie's hair color and length matches the screenshot sent by the informant. The trial court and Winter both relied on the unique changes to Currie's physical appearance to infer that the photograph was recent.

{¶35} We are instructed to "'give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *State v. Rogers*, 2022-Ohio-4535, ¶ 26 (1st Dist.), quoting *Ornelas v. United States*, 517 U.S. 690, 699 (1996). The totality of the circumstances—the Instagram story containing pictures of Currie carrying a firearm, combined with Winter's familiarity with Currie—is an objective and particularized ground for suspecting Currie committed a probation violation.

**{¶36}** Currie contends that Winter should have authenticated the photo given the rise of falsified photos and deepfakes[2] on social media and the internet. Currie, however, has not explained how the probation officers might authenticate the photo to rule out the possibility of digital manipulation of the images. Reasonable suspicion depends on "'"factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."'" *Ornelas* at 695, quoting *Gates*, 462 U.S. at 231, quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949). And reasonable suspicion does not require "rul[ing] out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002).

**{¶37}** The text messages sent to Winter included screenshots of an Instagram story depicting a man with a firearm in his waistband. The account name was phonetically identical to Currie's name. Winter identified the man in the photos as Currie based on her familiarity with Currie and his unique physical appearance. These facts were sufficiently reliable to establish reasonable grounds under R.C. 2951.02 to search Currie. And under his probation agreement, Currie agreed to be searched if there were reasonable grounds to believe that he violated the terms of his probation. Therefore, the search of Currie fell within the scope of Currie's consent and did not offend the Fourth Amendment.

**{¶38}** Currie also claims that the search of the Race Street apartment violated his Fourth Amendment rights because it exceeded the scope of his consent. But again, the anonymous tip established objectively reasonable grounds to believe that Currie had violated the terms of his probation. Currie consented to a search of his residence

---

[2] A "deepfake" is an artificial-intelligence-generated image or video of "people taking actions and having conversations that never happened." *See* Nina I. Brown, *Deepfakes and the Weaponization of Disinformation*, 23 Va.J.L. & Tech. 1, 5 (2020).

if there were reasonable grounds to believe that he had violated his probation. Because the probation officers had reasonable grounds to believe that a probation violation had occurred, the search of the apartment was constitutional as a consent search.

**{¶39}** Because the anonymous tip, corroborated by Winter's familiarity with Currie, provided sufficiently reliable information to establish reasonable grounds to believe that Currie had violated the terms of his probation, we hold that the searches of Currie and the apartment did not violate the Fourth Amendment.

**{¶40}** We overrule Currie's first assignment of error.

### B. <u>Currie's three-year minimum is not contrary to law</u>

**{¶41}** In his second assignment of error, Currie maintains that the trial court erroneously imposed an indefinite sentence with a three-year minimum. First, he argues that the sentence imposed by the trial court is contrary to law because second-degree felonies carry a two-year minimum term under R.C. 2929.14(A)(2)(a). He also claims that the record does not support a three-year minimum sentence.

**{¶42}** The scope of our review of a criminal defendant's sentence is limited. *See State v. Walker,* 2024-Ohio-6079, ¶ 44 (1st Dist.). We may modify or vacate Currie's sentence only if we "clearly and convincingly" find it "otherwise contrary to law." R.C. 2953.08(G)(2)(b). A sentence is not "clearly and convincingly contrary to law" if the trial court "consider[ed] the R.C. 2929.11 and 2929.12 factors, properly impose[d] postrelease control, and impose[d] a sentence within the statutory range." *State v. Hart*, 2024-Ohio-4552, ¶ 12 (1st Dist.). Under Ohio's indefinite-sentencing scheme, the trial court's discretion is limited to determining "the length of the minimum term under R.C. 2929.14(A)(1)(a) and (A)(2)(a)." *State v. Smith,* 2022-Ohio-3629, ¶ 11 (1st Dist.), quoting *State v. Rogers,* 2021-Ohio-3282, ¶ 17 (12th Dist.); *see State v. Delvallie,* 2022-Ohio-470, ¶ 44 (8th Dist.).

**{¶43}** Currie claims that the trial court mistakenly imposed a three-year minimum sentence as part of his indefinite sentence because it misconstrued the sentencing statute to require a three-year minimum. The trial court found Currie guilty of a second-degree felony. Under R.C. 2929.14(A)(2)(a), a prison term for a second-degree felony "shall be an indefinite prison term with a stated minimum term selected by the court of two, three, four, five, six, seven, or eight years and a maximum term that is determined under [R.C. 2929.144]."

**{¶44}** The record belies Currie's claim that the trial court mistakenly advised him that second-degree felonies carry a three-year mandatory minimum. Before proceeding to sentencing, the trial court informed Currie that the sentencing statutes required it to "select the minimum term for the range of penalties for the crime [and] for the felony of the second degree, it's two to eight years." The trial court asked Currie's attorney what she calculated as "the longest minimum sentence that he could serve?" Currie's counsel responded, "I thought that was that three we discussed earlier." The record suggests that the trial court relied on the minimum sentence discussed by the parties when it announced its selection of a three-year minimum. And that three-year minimum selected by the trial court falls within the statutory range for minimum sentences prescribed by R.C. 2929.14(A)(2)(a), meaning his sentence is not contrary to law.

**{¶45}** Currie also contends that the record does not support a three-year minimum sentence. But we may only reduce or modify a sentence if "the record does not support the sentencing court's findings under" R.C. 2929.13(B) or (D), 2929.14(B)(2)(e) or (C)(4), or 2929.20(I). R.C. 2953.08(G)(2)(a). These statutes are inapplicable to Currie's sentence, and we are prohibited from otherwise "'independently weighing the [relevant sentencing] factors in R.C. 2929.11 and

2929.12 to substitute our judgment for that of the trial court "concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12."'" *Hart*, 2024-Ohio-4552, at ¶ 11 (1st Dist.), quoting *State v. Mimes*, 2021-Ohio-2494, ¶ 17 (1st Dist.), quoting *State v. Jones*, 2020-Ohio-6729, ¶ 42. Therefore, Currie's record-based argument is beyond the scope of our review.

**{¶46}** We overrule Currie's second assignment of error.

### III.    Conclusion

**{¶47}** We overrule Currie's two assignments of error and affirm his conviction.

Judgment affirmed.

**KINSLEY, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.